IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MR. DAVID BURTON )<br>)<br>) <br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>DUQUESNE UNIVERSITY )<br>)<br>)<br>**Defendant.** )<br>) | Civil Action<br><br>No. __2:22-cv-96__<br><br><br>JURY TRIAL REQUESTED |

**COMPLAINT**

**PRELIMINARY STATEMENT**

As set forth below, Plaintiff, Mr. David Burton, by and through his undersigned counsel, Attorney Kristen Weidus, Attorney Lisa Postlewait, and Ruder Law, LLC, alleges race-based discrimination in violation of the United States Constitution, 42 U.S.C. Section 1981, Title VI of the Civil Rights Act of 1964, and a state law violation of breach of contract.

**PARTIES**

1. Plaintiff was at all relevant times a student in Duquesne University's Counseling Education and Supervision Program.

2. Defendant, Duquesne University (hereinafter "Defendant," or "Duquesne"), is a recipient of federal financial assistance and is therefore legally bound by the provisions of Title VI of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Defendant is located in this venue and the events giving rise to the claims at issue occurred in the venue.

## FACTUAL ALLEGATIONS

5. Plaintiff David Burton (hereinafter "Plaintiff" or "Mr. Burton") is a former doctoral candidate in Defendant Duquesne University's Counseling Education and Supervision Program (hereinafter "Defendant," or "Duquesne").

6. Plaintiff applied and chose to attend Duquesne University in the Fall of 2011. Because Duquesne University is a faith-based institution, as a Christian Mr. Burton believed its counseling education program, its professors, and the University's mission would align with his core beliefs and afford him an opportunity to grow as a therapist in a supportive environment.

7. Plaintiff began his studies at Duquesne University with the goal of earning his PhD.

8. During his time at Duquesne, Plaintiff experienced multiple incidents of overt racial discrimination and years of disparate treatment by University professors and staff.

9. During Plaintiff's first year alone, he was subjected to inappropriate, discriminatory, and unjustified student reviews. In addition, during his tenure at Duquesne, he experienced two incidents of police harassment, intimidation tactics by administration, and a lack of departmental support.

10. More specifically, on October 14, 2014, as a fourth year doctoral student, Plaintiff was a victim of harassment by Defendant's security. Plaintiff took down the name and badge numbers of the security guards in question, and he emailed Defendant to request information on filing a formal harassment and discrimination complaint against the alleged offenders.

11. Upon information and belief, Defendant did not appropriately investigate Plaintiff's concerns.

12. On June 21, 2019, Plaintiff emailed Defendant regarding his concerns about discriminatory and unethical practices at the University and with Department Faculty.

13. Plaintiff was scheduled to defend his dissertation on June 27, 2019. However, on June 26, 2019, Defendant emailed Plaintiff to inform him that his dissertation submission was unacceptable to three committee members, and rather than failing him, Defendant suggested he postpone his dissertation defense. Defendant informed Plaintiff that he would have to apply for an extension, because the statute of limitations was expiring.

14. Later that day, Plaintiff emailed Defendant about his concerns regarding racial discrimination.

15. Prior to that date, Plaintiff's submission chair had suggested revisions only to chapter five of his dissertation and indicated Plaintiff may or may not be permitted defend his submission. Plaintiff was told the committee would make a final decision on his approval to defend by June 18, 2019, but they did not provide him with any information until June 20, 2019. At that time, he was informed that he was no longer in the program.

16. In response, Plaintiff wrote a letter explaining his concerns about the University's decision and policies, and simply requested an opportunity to defend his dissertation.

17. On July 11, 2019, Plaintiff learned that Defendant had reconsidered its position, and was extending his statute of limitations for one semester, permitting him the opportunity to finish and defend his dissertation.

18. A suggested timeline for chapter submissions and revisions was included in Defendant's letter to Plaintiff explaining the conditions of his extension and following receipt, Plaintiff had a conversation with the faculty about his plan to finish his work.

19. Defendant's letter outlined a suggested timeline, but it in no way stated that Plaintiff was required to follow it explicitly or risk being removed from the program. Furthermore, Plaintiff's conversations with his professors indicated that the timelines were to be used as a guide and resource, but they were not mandatory.

20. Plaintiff's stress and anxiety grew, but his diligence and commitment to his work remained.

21. Plaintiff had concerns about Defendant's practices and recommendations for completing his dissertation. Rather than permitting Plaintiff to spend time focusing on dissertation research, Defendant imposed unnecessary revisions and continued to require Plaintiff to make additional edits, thereby running out the clock so he could not feasibly submit a final product in the time required.

22. At all times, Plaintiff listened to feedback, embraced his responsibility to his research and education, and attempted to complete the work he was asked to in order to graduate.

23. Plaintiff was aware of the statute of limitations on his PhD, and he was also aware that other students had and continue to receive opportunities to take more time to submit their best and most accurate work. Plaintiff, a minority, was treated differently, and he was not afforded the same opportunity as other students.

24. On January 17, 2020, Defendant dismissed Plaintiff from the PhD program and stated Plaintiff was prohibited from proceeding with his pursuit of his doctoral degree in counselor education.

25. Plaintiff was not provided with any information on how to challenge Defendant's final decision.

26. On January 30, 2020, Plaintiff emailed Defendant with concerns regarding how he was treated academically, and he expressed concerns about racial bias. Defendant did not respond to Plaintiff.

27. On February 5, 2020, Plaintiff emailed Defendant again to request a response to his previous communication regarding concerns of discrimination and racial bias, but Defendant again did not respond.

28. Upon information and belief, Defendant did not investigate Plaintiff's discrimination concerns.

29. Following Defendant's lack of engagement and stalling tactics, Defendant dismissed Plaintiff from its doctoral program after eight years of work, thereby denying Plaintiff the opportunity to defend his dissertation and earn his diploma.

30. Despite years of disparate and discriminatory treatment, Plaintiff worked hard to persevere and succeed, yet he was denied a doctoral degree at the end of the Fall 2019 term.

31. Plaintiff spent eight years and over $180,000 to research, learn, grow, and produce a product he was proud to present.

32. Plaintiff was prepared to submit and defend a dissertation, but Defendant prohibited him from doing so.

33. Plaintiff alleges that his experience in Defendant's program was riddled with discrimination, micro-aggression, and undue criticism, and Defendant discriminated against him on the basis of race in denying him an opportunity to defend his dissertation, despite having permitted other enrolled students in similar circumstances to do so.

34. The challenges Plaintiff faced due to Defendant's discriminatory practices and actions created stress and anxiety, depression, and increased his blood pressure. Plaintiff has been forced to seek medical treatment for these conditions as a direct result of the trauma he experienced as a student.

## ARGUMENT

**COUNT I: UNCONSTITUTIONAL VIOLATION OF 42 U.S.C. SECTION 1981**

35. The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

36. Under 42 U.S.C. § 1981, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

37. Although § 1981 does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

38. In *Broom v. Saints John Neumann & Maria Goretti Cath. High Sch.*, 722 F. Supp. 2d 626 (E.D. Pa. 2010), the Court asserted: "Section 1981 was amended in 1991 to add a subsection defining the term 'make and enforce contracts' to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" 42 U.S.C. § 1981(b). This amendment broadened the scope of § 1981 to reach harassing conduct that occurs after the formation of a contract and permits claims under the statute for creating a racially hostile environment. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372–73 (2004).

39. In Pennsylvania, it is long standing that a contractual relationship exists between private educational institutions and an enrolled student.

40. In *Swartley v. Hoffner*, 734 A.2d 915 (Pa. Super. Ct. 1999), the court stated:

> Based upon the prior statements of our Court, as well as the numerous learned decisions of other courts, we now hold that the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract.

*Cavaliere v. Duff's Business Inst.,* 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (finding that a breach of contract suit against a private educational institution would be theoretically viable in certain circumstances); *Crabtree v. California Univ. of Pennsylvania*, 606 A.2d 1239, 1240 (Pa. Commw. Ct. 1990) (refusing to hold that a

university catalog constituted a contract between a private university and a student, but nonetheless finding that, if the catalog was a contract, the university did not violate the contract); *Boehm. v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990) (stating that the relationship between a private college and its students is contractual in nature); cf. also *Merrow v. Goldberg*, 672 F.Supp. 766, 774 (D.Vt.1987); *Petock v. Thomas Jefferson University*, 630 F.Supp. 187, 191 (E.D.Pa.1986); *Jansen v. Emory University*, 440 F.Supp. 1060 (N.D.Ga.1977), aff'd, 579 F.2d 45 (5th Cir. 1978).

41. Plaintiff is a racial minority who was at all relevant times enrolled as a student in Duquesne University, a private Catholic educational institution.

42. Plaintiff paid Defendant's tuition, a total of over $180,000 in eight years.

43. A contractual relationship existed between Plaintiff and Defendant.

44. Defendant violated Plaintiff's constitutional rights under Section 1981 by breaching its contract with Plaintiff and violating its own student handbook policies and procedures regarding anti-discrimination.

45. Defendant has a clear nondiscrimination policy. Article II on page five of Defendant's Student Handbook states:

> **Article II – Statement of Non-Discrimination**
>
> Motivated by its Catholic identity, Duquesne University values equality of opportunity; human dignity; and racial, cultural and ethnic diversity, both as an educational institution and as an employer. Accordingly, the University prohibits and does not engage in discrimination or harassment on the basis of race, color, religion, national origin, gender, sexual orientation, age, disability, status as a veteran and any other legally protected classes. Further, Duquesne University will continue to take affirmative steps to support and advance these values consistent with the University's Mission Statement.

> This policy applies to all educational programs and activities of the University, including, but not limited to, employment practices, admission, educational policies, scholarship and loan programs, and athletic or other University-sponsored programs. This is a commitment by the University in accordance with its religious values and applicable federal, state and local laws and regulations including Title IX of the Education Amendment Acts of 1972. Nothing herein, however, should be interpreted as a waiver by the University of its own Constitutional and legal rights based upon its religious affiliation.
>
> Revised: December 2011

46. Defendant violated these policies and procedures by encouraging, tolerating, ratifying, and being deliberately indifferent to the following practices and customs, and there is a need for more or different training, supervision, investigation, or discipline in the areas of: appropriate responses to reports of race-based discrimination, disparate treatment, and harassment.

47. Defendant's tolerance and indifference to the racial discrimination created a racially hostile environment for Plaintiff and prevented Plaintiff from receiving an equal benefit from their enforceable contract.

48. Plaintiff's right to access the educational opportunities, programs, services, and supports provided to all students was interfered with as a result of Defendant's failure to adequately and appropriately train its employees.

49. Even following reports by Plaintiff to Defendant, Defendant failed to take appropriate action to investigate and address the race-based discrimination.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant appropriate relief including monetary damages, attorneys' fees, costs, and all other relief as is appropriate and necessary.

## COUNT II: UNCONSTITUTIONAL VIOLATION OF 42 U.S.C. SECTION 1981 RETALIATION

50. The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

51. For a retaliation claim under § 1981, a plaintiff must show: "(1) she engaged in a protected activity, (2) there was adverse action after or contemporaneous with the protected activity, and (3) a causal link exists between the adverse action and the protected activity." 42 U.S.C.A. § 1981; *Andreoli v. Gates,* 482 F.3d 641, 649 (3d Cir.2007).

52. Plaintiff engaged in a protected activity by voicing concerns regarding Defendant's unethical and discriminatory practices.

53. Defendant prevented Plaintiff from completing and defending his dissertation and graduating with his PhD.

54. Plaintiff communicated his concerns about racial discrimination to University and Department administration and faculty and was almost immediately told that he did not meet the qualifications to defend his dissertation after doing so.

55. Plaintiff continued to voice concerns about discriminatory practices, and Defendant ignored him.

56. Defendant ultimately dismissed Plaintiff from its program without recourse.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant appropriate relief including monetary damages, attorneys' fees, costs, and all other relief as is appropriate and necessary.

**COUNT III: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

57. The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

58. Title VI of the Civil Rights Act of 1964 provides that: "no person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.

59. "To state a Title VI claim, a plaintiff must allege that he or she (1) was a member of a protected class, (2) qualified for the benefit or program at issue, (3) suffered an adverse action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Se. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F.Supp.3d 688, 701 (E.D.Pa.2015) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir.2014)). An allegation of intentional discrimination is required and may be satisfied 'with evidence demonstrating either discriminatory animus or deliberate indifference.'" *Gilead*, 102 F.Supp.3d at 701; *Blunt*, 767 F.3d at 272; see *David v. Neumann Univ.,* 177 F. Supp. 3d 920 (E.D. Pa. 2016).

60. The United States Department of Education has promulgated regulations pursuant to Title VI that prohibit recipients of its funds from taking certain actions to the extent that those actions have a disparate impact on groups protected by the statute. 34 C.F.R. §100 et seq.

61. The language of Title VI's implementing regulations provides, in relevant part:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other

11

> benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
> 34 C.F.R. § 100.3.

62. To establish liability under the Title VI regulations, a plaintiff must demonstrate that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002).

63. If a plaintiff makes such a prima facie showing, the defendant then bears the burden of demonstrating the educational necessity of its practices and must show that the challenged course of action is necessary to meet an important educational goal. *Id*. See also *Shaw v. Reno*, 509 U.S. 630, 634 (1993).

64. In the instant case, upon information and belief, Defendant is the recipient of federal funding and its failure to appropriately train staff to respond and investigate claims amounts to racial discrimination.

65. Furthermore, upon information and belief, Plaintiff, as a racial minority, was treated differently than similarly situated students who were not minorities.

66. Plaintiff expressed to Defendant his concerns about racial discrimination and unethical practices.

67. Upon information and belief, Defendant placed unnecessary barriers on Plaintiff that prevented him from defending his dissertation.

68. Defendant refused to permit Plaintiff to have an extension to finish the work Defendant claimed Plaintiff needed in order to graduate.

69. Plaintiff was enrolled and working on his PhD for over eight years when Defendant dismissed him from its program without recourse and without good cause.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award Plaintiff all remedies available under Title IV of the Civil Rights Act of 1964 for these violations, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## COUNT IV: BREACH OF CONTRACT

70. The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

71. To establish a breach of contract claim under Pennsylvania law, a party must establish: the existence of a contract; a breach of duty imposed by the contract; and damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).

72. When it interprets a contract, a court must determine the intent of the parties and it must give effect to all provisions of the contract. *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. 1993).

73. The implied duty of good faith in Pennsylvania "is not limitless. Rather, there must be some relationship to the provisions of the contract itself to invoke the duty of good faith." *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 170 (3d Cir. 2013).

74. In *Haywood v. University of Pittsburgh*, the district court explained that a breach of the implied duty of good faith is a breach of contract between the parties. *Haywood*, 976 F. Supp. 2d 606, 627 (W.D. Pa. 2013).

75. The determination of whether a party failed to exercise good faith in the performance of a contract is fact-based. *Id*. at 129. "The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way." *Id.* (quoting *Montanez v. HSBC Mortg. Corp.*, 876 F.Supp. 2d 504, 513 (E.D. Pa. 2012)) (quotation removed).

76. In Pennsylvania, it is long standing that a contractual relationship exists between private educational institutions and an enrolled student.

77. At all relevant times, Plaintiff was an enrolled student within Defendant's educational institution.

78. Plaintiff paid over $180,000 in tuition and fees while he attended and participated in Defendant's graduate program.

79. Plaintiff had access to Defendant's student handbooks, policies, and procedures.

80. Defendant breached its contract with Plaintiff by violating the policies and procedures within its student handbook, as further outlined in Count I above.

81. Plaintiff experienced race-based discrimination while attending the University, representing further violation of Defendant's policies and procedures.

82. More specifically, Plaintiff experienced race-based discrimination in the form of overt harassment, micro-aggression, and disparate treatment by Defendant's faculty and staff.

83. Upon information and belief, Defendant was aware of Plaintiff's concerns regarding discrimination and disparate treatment, but Defendant failed to take any action to investigate Plaintiff's allegations or train the faculty and staff who were responsible.

84. As a result of Defendant's breach, Plaintiff suffered damages in the form of loss of an education and income, fear, anxiety, and stress.

85. Moreover, Defendant's breach of contract prevented Plaintiff from securing his PhD, as well as the employment opportunities and potential earnings Plaintiff would have secured had he received his doctoral degree as planned at the end of 2019.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court award Plaintiff all remedies available for these breach of contract violations, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor and against Defendant as follows:

a) Assuming jurisdiction of the case;

b) Declaring that Defendant's actions and omissions constituted race-based discrimination against Plaintiff;

c) Requiring Defendant to permit Plaintiff to re-enroll in its program;

d) Requiring Defendant to afford Plaintiff the opportunity to submit and defend his dissertation;

e) Upon successful completion of his dissertation, Defendant shall be required to permit Plaintiff to graduate with his PhD and to attend graduation;

f) Reimbursement of tuition and related fees;

g) Compensatory damages;

      h)      Punitive damages;

      i)      Attorneys' fees and costs; and

      j)      Such other relief as this Court deems just and proper.

Respectfully submitted,

| /s/ *Kristen C. Weidus* | /s/ *Lisa Postlewait* |
|---|---|
| Kristen C. Weidus, Esq. | Lisa Postlewait, Esq. |
| Attorney I.D. No. 313486 | Attorney I.D. No. 309606 |
| Ruder Law, LLC | Ruder Law, LLC |
| One Oxford Center | One Oxford Center |
| 301 Grant Street, Suite 270 | 301 Grant Street, Suite 270 |
| Pittsburgh, PA 15219 | Pittsburgh, PA 15219 |
| Phone: (412) 281-4959 | Phone: (412) 281-4959 |
| Fax: (412) 291-1389 | Fax: (412) 291-1389 |
| Email: kristenweidus@ruderlaw.com | Email: lisapostlewait@ruderlaw.com |