IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID BURTON, ) | |
| ) | No. 2:22-00096 |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Robert J. Colville |
| ) | |
| DUQUESNE UNIVERSITY, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**MEMORANDUM ORDER**

Robert J. Colville, United States District Judge

      Before the Court is a Motion to Dismiss (ECF No. 20) filed by Defendant in this matter. Defendant moves to dismiss all counts in Plaintiff's First Amended Complaint (ECF No. 13), arguing that Plaintiff has failed to state a claim upon which relief can be granted. The Court has subject matter jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1332(a). The Motion has been fully briefed and is ripe for disposition.

**I.    Factual Background & Procedural History**

      In the Fall of 2011, Plaintiff, David Burton, enrolled as a Ph.D. candidate at Duquesne University. Plaintiff describes himself as a "racial minority."[1] ECF No. 13 ¶ 98. From the start of his time at Duquesne, Plaintiff faced multiple incidents that he interpreted as, and now seemingly alleges constitute, overt racial discrimination and disparate treatment by professors and staff, including police harassment, intimidation tactics by administration, and a lack of departmental support.

---

[1] The Complaint does not further illuminate as to Plaintiff's status as a protected class. Throughout this Opinion the Court will endeavor to adopt the plaintiff's self-identifying characterization.

1

In the Complaint, Plaintiff sets forth the following factual allegations relevant to the Court's consideration of the Motions at issue:

Plaintiff describes an incident when he attempted to enter the university computer lab after hours, for which he had received prior approval.[2] When he refused to present his identification to security, the guards prevented him from entering, and he was forced to get additional confirmation from the department that he was cleared to enter the premises for computer lab use. Plaintiff alleges that when he brought this and other incidents to the attention of the school administration, his concerns were not addressed.

Plaintiff emailed the university regarding an October 14, 2014 incident, which involved another interaction with a security guard, seeking information on how to file "a formal harassment and discrimination complaint." In his Complaint before this Court, Plaintiff alleges he "was a victim of harassment," but describes neither anything about what occurred during the incident, nor what, if any, information about the incident was reported to Defendant. Plaintiff does not assert that his request was ignored, or otherwise describe what, if any, response Defendant offered. Plaintiff does, however, assert that his concerns were never appropriately investigated.[3]

Plaintiff asserts that he "was falsely accused of harassing the Dean's secretary." Plaintiff asserts that while he "was called into a meeting, . . . the allegations and concerns were eventually dropped." *Id.* ¶ 14. Plaintiff further asserts that "[y]ears later, Plaintiff encountered the [Dean's former] secretary off-campus, [who] told Plaintiff that the Dean forced her to accuse Plaintiff of

---

[2] Plaintiff does not assert a date of the incident.
[3] Moreover, within his allegations respecting these incidents, Plaintiff never explicitly asserts that the "harassment" he was subjected to was, or might reasonably be inferred to be, on the basis of race.

harassment, threatening her job if she failed to do so. Upon information and belief, this individual quit her job, and told the Dean she would not make false accusations." *Id.* ¶¶ 15–17.[4]

Plaintiff asserts that his supervising professor "reviewed and approved" multiple "student reviews" respecting Plaintiff, alleging inappropriate conduct. These "student reviews" are not meaningfully described by Plaintiff except that one was based upon an allegation of Plaintiff's tardiness, which Plaintiff seemingly admits, asserting it was caused by "an audit at work," and another involved "a Caucasian peer claim[ing] Plaintiff engaged in unprofessional behavior while participating in a personal growth exercise," which Plaintiff does not otherwise describe, but asserts involved "Plaintiff's statements . . . made in an educational setting with peers, and Plaintiff believed his actions were in line with current research." *Id.* ¶ 24. Plaintiff further asserts that he "accepted responsibility for the Department's concern after this incident, but . . . believed he was being mistreated and his full compliance was the only way to protect himself." *Id.* ¶ 25. The identity of the complainants, the truth or falsity of the claims in the reviews, and the nature or outcome of Plaintiff's supervising professor's review and approval of these student reviews is not at all meaningfully described or alleged. Plaintiff asserts that his peers were not subject to the same sort of criticism.[5]

A few years into Plaintiff's program, his supervising professor, Dr. Kolbert, visited Plaintiff's field placement Mentor and "made concerning statements" to the Mentor and "questioned Plaintiff's ability to appropriately counsel his patients." *Id.* ¶ 29. Plaintiff asserts that neither he nor his Mentor "understood Dr. Kolbert's statements," that "Dr. Kolbert failed to explain what specific practices or behaviors concerned him," and that "Plaintiff's Mentor warned Plaintiff

---

[4] These allegations are specifically noted here, because, if true, they are deeply, troubling. However, for purposes of Plaintiff's claims of discrimination, they are of little value as Plaintiff makes no allegation that either the Dean's conduct or the secretary's conduct were in any way due to Plaintiff's race.
[5] Plaintiff's allegations respecting "his peers" is not, in this instance, racially qualified.

3

that Dr. Kolbert appeared to be 'out to get him.'" *Id.* ¶ 30–32.  Respecting this incident, Plaintiff does assert that his "non-minority peers" within the same program were not subject to such criticism.  Beyond this assertion, however, Plaintiff offers no additional facts to support an inference that Dr. Kolbert's actions were due to Plaintiff's race.  Moreover, while it is understood that few students enjoy the experience of hearing that their professors have concerns about their abilities, it is not entirely clear how these comments and actions by Dr. Kolbert in any manner hindered Plaintiff in obtaining his degree.[6]

Plaintiff's statute of limitations to submit and defend his dissertation and complete his degree was originally set for August 2019.  However, when he submitted his dissertation proposal on "multi-cultural competence in the workplace," the dissertation committee did not respond.[7] With six months left before his initial statute of limitations was set to expire, Plaintiff pressed the committee for a response, after which his proposal was approved and scheduled to be defended on June 27, 2019.[8]  "On June 21, 2019, Plaintiff emailed Defendant regarding his concerns about discriminatory and unethical practices at the University and with Department Faculty." *Id.* ¶ 43.

On June 26, 2019, Plaintiff was informed that three members of the committee had concerns about his submission, and that he should apply for an extension to his statute of limitations to allow him extra time to complete and defend his dissertation.  Plaintiff was not given explicit assurances that such an application would be accepted.  That same day, Plaintiff submitted a letter to the Office of the Provost requesting an opportunity to defend his dissertation.  In the letter, Plaintiff also described several objections he had regarding how unfairly he was being

---

[6] While the Court notes that the phrase "out to get him" may imply that Dr. Kolbert may have been seeking to hinder Plaintiff's ability to obtain his degree, Plaintiff does not connect the dots on this implication.
[7] Plaintiff does not assert the date that he submitted his proposal.
[8] Plaintiff does not assert what amount of time transpired between his submission of the proposal and his follow-up with the committee.  He also does not assert what date his proposal was approved or what date he was advised that he would not be allowed to defend his dissertation on June 27, 2019 as previously scheduled.

treated, including concerns about racism and discrimination, specifically asserting that "he 'had a very traumatic, racial-charged, unethical, and discriminatory experience at this university.'" *Id.* ¶ 48.  On July 11, 2019, Plaintiff learned that his statute of limitations would be extended by one semester.

The letter informing Plaintiff of the extension to his statute of limitations included revision and edit notes to every chapter of his dissertation, along with a proposed timeline. However, Plaintiff asserts that he understood this timeline to be merely "suggested" and not explicitly required.  Further, subsequent conversations with his supervising professor and other professors gave him the impression that the timelines "were to be used as a guide and a resource, and thus, both the timeline and the new December deadline were not mandatory.  *Id.* ¶ 56.

Over the months that followed, Plaintiff received numerous notes for revisions, "running out the clock" and "stalling" in Plaintiff's words, to such a degree that Plaintiff could not see himself feasibly submitting a final product by the December deadline. *Id.* ¶¶ 59 & 86.  Plaintiff alleges that the Dissertation Committee made numerous discouraging comments to Plaintiff like "we do not think you can do this," "we do not think you can finish this process," and "we do not think you can write." *Id.* ¶ 60.  Plaintiff asserts that he was thereby discouraged from finishing his dissertation and completing the Defendant's program and that his peers were not.[9]

Nevertheless, Plaintiff accepted the feedback and did his best to complete the work on time.  Plaintiff even enlisted third parties to review his work, including another professor at Duquesne and a professional Ph.D. dissertation editor, both of whom approved of Plaintiff's work and found the notes from the committee to be unfounded and overly fastidious.  Plaintiff made the

---

[9] Plaintiff makes these allegations "upon information and belief," and, in this instance, his allegation respecting his peers is not racially qualified.

5

suggested changes, submitted his dissertation on time, and requested an opportunity to defend it to the committee.

Plaintiff was never given this opportunity to defend his dissertation, and on January 17, 2020, he was dismissed from the program. In all, Plaintiff spent eight years and over $180,000 to earn his Ph.D. from Duquesne University. He did not receive the degree he sought. Plaintiff asserts that he was "aware that other students had and continue to receive opportunities to take more time to submit their best and most accurate work. Plaintiff, a minority, was treated differently, and he was not afforded the same opportunity as other students." *Id.* ¶ 71.

Throughout his time at the university, in addition to the October 2014 email regarding the security guard and the June 2019 letter sent to the Office of the Provost regarding the extension of his statute of limitations, Plaintiff sent three additional communications to the school: (i) a June 21, 2019 email requesting information on how to file a complaint for harassment and discrimination, (ii) a January 30, 2020 email expressing concerns with how he was treated academically and racial bias, and (iii) a February 5, 2020 email requesting a response to his January 30 email. Plaintiff feels that his concerns about race-based discrimination were never properly addressed.

Plaintiff brings claims against Defendant, Duquesne University, under 42 U.S.C. § 1981 for unequal contracting, hostile environment, and retaliation, under Title VI of the Civil Rights Act, and for breach of contract under Pennsylvania state law. On April 15, 2022, Plaintiff filed an Amended Complaint (ECF No. 13). On May 6, 2022, Defendant filed a Motion to Dismiss, along with a Brief in Support (ECF Nos. 14 & 15). On June 10, 2022, Plaintiff filed a Response in Opposition to the Motion to Dismiss, along with a brief in support (ECF Nos. 18 & 19).

**II.    Legal Standard**

Defendant moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 554). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then

7

determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g.*, *Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

### III.   Discussion

#### A.   Count I - Section 1981 Contract Claim & Count IV - State Law Contract Claim

Defendant moves to dismiss Plaintiff's discrimination in contracting claim under Section 1981 and his breach of contract claim under Pennsylvania state law, asserting that the Complaint does not identify a particular term of the contract that has been breached. 42 U.S.C. § 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." The right to make and enforce contracts includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *Runyon v. McCrary*, the United States Supreme Court found that Section 1981 includes the right to not face racial discrimination in contracting. 427 U.S. 160, 168 (1976).

In Pennsylvania, when students attend a private college, the parties enter into a contractual relationship. *Swartley v. Hoffner*, 734 A.2d 915 (Pa. Super. Ct. 1999). The Pennsylvania Superior Court describes the school's written procedures as part of the terms of the contract. *Id.* at 919. A breach of a school's bylaws or other similar internal rules and procedures is a breach of the student-academy contract. *Id.*

Defendant's student handbook includes the directive that "the University prohibits and does not engage in discrimination or harassment on the basis of race . . . [and] will continue to take affirmative steps to support and advance these values consistent with the University's Mission Statement. This policy applies to all educational programs and activities of the University, including, but not limited to . . . educational policies. . ." ECF No. 13 ¶ 102. Plaintiff posits that by allowing racial discrimination against Plaintiff, Defendant violated these written rules, and thereby breached its contract with Plaintiff and prevented Plaintiff from receiving equal benefits from the contract. *Id.* at 104.

Defendant responds that the excerpt from the Handbook does not include a specific action that Defendant failed to take. ECF No. 15 at 8. The "Complaint fails to identify any alleged training requirements, investigation obligations, academic standards, or other purported

obligations applicable to Plaintiff's breach of contract claims." *Id.* The Court is inclined to agree. The Handbook appears to provide an aspirational mission that amounts to noble, though ultimately, within the context of this lawsuit, generalized, imprecise, and incorporeal goals.[10] For a claim for breach of contract to proceed, the "allegations must relate to a specific and identifiable promise that the school failed to honor." *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011).

In *Vurimindi*, the plaintiff student sued for breach of contract, alleging that the university had violated its own mission statement and diversity statement, among other internal policies. 435 F. App'x at 132. The Third Circuit Court concluded that "even though guidelines and policies can include specific promises on which to base a cause of action, [the plaintiff] did not point to any specific and definite terms that were violated in his case." *Id.* These sorts of aspirational goals and quality prescriptions offer "no specific term that can be considered binding as a contract." *Id.* School mission statements simply provide the university's views on what it perceives as proper and what it strives for. *Id.* Because the plaintiff has failed to identify a specific, and relevant, contractually enforceable promise, the express breach of contract claims are dismissed.

The Court finds that without pointing to a specific contract provision that Defendant violated and how said provision was violated, a claim for breach of contract is not properly stated. As to Counts I and IV, Defendant's Motion to Dismiss is granted. As the Court will order in the Conclusion, Plaintiff may submit an amended complaint within 21 days of this order. Allowing that Plaintiff may attempt to amend this claim, the Court will defer weighing in on the matter of breach of the implied duty of good faith.

### B. Count I – Section 1981 Hostile Environment

---

[10] Needless to say, such goals have moral weight and substance.

Defendant also moves to dismiss Plaintiff's claim in Count I that Defendant created a racially hostile environment. ECF No. 15 at 11. As the Court reads it, the Complaint does not assert a claim for a racially hostile environment, but the parties debate the matter in the various pleadings and briefs, and so the Court will provide brief analysis without a formal ruling here.

In 1991, Section 1981 was amended to prevent harassment and the creation of a hostile environment after the formation of a contract. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004). To state a claim for a hostile educational environment under Section 1981, a plaintiff must allege: "(1) that he is a member of a protected class; (2) that he was harassed because of race; (3) that defendant had actual knowledge of and was deliberately indifferent to the harassment; and (4) that the harassment was so severe and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school." *Ke v. Drexel Univ.*, WL 5316492, at *32 (E.D. Pa. Sept. 4, 2015), aff'd sub nom. *Lei Ke v. Drexel Univ.*, 645 F. App'x 161 (3d Cir. 2016).

Plaintiff argues that these elements are met, because (i) he is a member of a protected class, (ii) he faced ongoing racism from Defendant, (iii) he sent numerous communications to Defendant of this treatment, which persisted, and (iv) by this treatment, he was prevented from defending his dissertation and graduating. Plaintiff contends further that under the *McDonnell Douglas* burden shifting doctrine, he should not have to provide direct evidence of discrimination prior to discovery, and can instead rely on circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Direct evidence of discrimination takes the form of facts showing direct intent to discriminate, such as an admission from a defendant that he took an action because of a plaintiff's race. Circumstantial evidence would be indirect evidence that nevertheless supports the inference

11

of racism, such as minority students receiving one form of treatment, while a disproportionate number of otherwise materially similar non-minority students receive another.[11]

Many of Defendant's actions as described by Plaintiff strike the Court as quite regular, expected, and acceptable behaviors. For instance, the experience Plaintiff recounts involving being stopped by security from entering the computer lab does not strike the Court as unusually antagonistic, even if Plaintiff perceived it that way. And, more importantly for the court's purposes, Plaintiff points to no facts to suggest that the incident took place because of Plaintiff's race. Students are regularly asked to present identification in order to enter school grounds after hours, and when they refuse, security personnel are understandably, if not properly, suspicious.[12] Additionally, the fact that Plaintiff was subject to negative student reviews for allegations of inappropriate conduct while his peers were not, does not give rise to an inference of discrimination. From the Court's perspective, and upon a fair reading of the Complaint, it is plausible that Plaintiff simply engaged in inappropriate conduct (or was, for a non-race-based reason, inaccurately perceived to have done so) while his peers did not. Plaintiff proffers no allegations to the contrary.

Plaintiff does, however, provide factual allegations in support of claims of racism in the singular incident involving Plaintiff's supervising professor, Dr. Kolbert, who, Plaintiff alleges, visited Plaintiff's field placement mentor, and "made concerning statements" and "questioned

---

[11] While far from dispositive of any issue before the Court, nowhere does Plaintiff proffer allegations respecting: 1. the number of minority versus non-minority students, graduate students, or doctoral candidates enrolled in the University, the Department, or Plaintiff's program, 2. the rate of disproportionate racial treatment, or, 3. any other instance of discrimination towards a single other minority student that would suggest that Plaintiff's experience was not simply about him as an individual irrespective of his race.

[12] The Court notes that sometimes the bare facts do not fully describe the experience that individuals of protected classes personally experience in a professional or educational environment, and that the victims of discrimination may feel that they "know it when they see it," even if to another such treatment might seem innocuous. Nonetheless, in many instances, the facts as presented in the pending Complaint simply do not allow the Court to reasonably draw an inference of racial motivation, as they are too consistent with normal and pedestrian behaviors and experiences. Nonetheless, Plaintiff will have an opportunity to amend the Complaint and expound upon his allegations, if warranted.

Plaintiff's ability to appropriately counsel patients." There, at least, plaintiff asserts that "non-minority peers" within the same program were not subject to such criticism.

However, this singular instance does not rise to the level of "so severe and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school." *Ke*, WL 5316492, at *32. While Plaintiff asserts that this event demonstrates that Defendant was, on some level, "out to get him," he does not adequately allege facts to allow the Court to reach the same conclusion. The Complaint is punctuated by several stand-alone, baldly asserted, conclusory, and boilerplate recitations. But substantively and factually unsupported allegations of race-based discrimination are inadequate.

### C. Count II - Section 1981 Retaliation

Plaintiff also brings a claim for Retaliation pursuant to 42 U.S.C. § 1981, which Defendant moves to dismiss on grounds that there is no causal link between any alleged protected activity and any adverse decision. ECF No. 15 at 16. To state a claim for Retaliation under Section 1981, a plaintiff must show that "(1) [he] engaged in a protected . . . activity, (2) [the defendant] took an adverse . . . action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007). To establish this causal link, "[o]ur case law has focused on two main factors . . . : timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

Plaintiff alleges that he engaged in protected activity by voicing his concerns about certain discriminatory practices Defendant engaged in. ECF No. 13 ¶ 109. As the Complaint puts it, almost immediately after Plaintiff voiced these grievances, the university took the adverse action

13

by preventing him from meeting the qualifications to defend his dissertation and graduating. *Id.* at 111.

Defendant argues that the protected activities did not take place immediately before the alleged adverse actions. ECF No. 15 at 12. The only protected activity that took place prior to June 2019, when Defendant first informed Plaintiff that he could not defend his dissertation, was the October 2014 email, which occurred some five years before Defendant's supposedly retaliatory act. Plaintiff sent the June 2019 email, the June 2019 letter, the January 2020 email, and the February 2020 email after Defendant informed Plaintiff of its decision to not allow him to defend his dissertation. As such, Defendant argues, Plaintiff has not established a causal link between the protected activity and the adverse action. *Id.* at 18. Further, Defendant notes, after Defendant's June 2019 communication with Plaintiff that he could not defend his dissertation, Plaintiff was granted an extension, (but Plaintiff failed to meet his new deadline).

The Court does not agree with Defendant. Defendant took an adverse action against Plaintiff following all of the protected communications outlined in the Complaint, by making a final decision to refuse to allow Plaintiff to defend his dissertation and graduate. While Defendant may have informed Plaintiff that the extension was for but one semester, as Plaintiff puts it, there was no specific hard deadline communicated to him. Further, Defendant is to this day, after all of Plaintiff's protected communications, refusing to grant Plaintiff further extensions to defend his dissertation and graduate.

The Court is mindful that "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). In *Marra v. Philadelphia*, the Third Circuit Court explained that when some time has

passed between the protected activity and the alleged retaliation, "courts may [still] look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the [plaintiff], or other types of circumstantial evidence, such as inconsistent reasons given by the [defendant] for [retaliation] . . . that give rise to an inference of causation when considered as a whole."  497 F.3d 286, 302 (3d Cir. 2007) (internal citations omitted).

The Court finds that while some of the actions Defendant took in the intervening time were charitable, if not generous, toward Plaintiff, the primary point of contention is, essentially, that the extension was a mere empty gesture, as it came with so many strings attached that Plaintiff was virtually guaranteed to fail to meet Defendant's demands.  In *Miller v. Thomas Jefferson Univ. Hosp.*, the Third Circuit Court found that evidence of positive intervening treatment from a defendant can be evidence against a claim for Retaliation.  565 F. App'x 88 (3d Cir. 2014) (finding that because the plaintiff had also received positive reviews, negative reviews could not be used to establish retaliation).  But in *Miller*, there was a bright line between the negative and the positive.  The plaintiff alleged retaliation in the form of negative reviews, while he also received unmitigated positive reviews.  Here, the positive treatment is undermined or undone by the inclusion of requirements that Plaintiff describes as unrealistic.

The Court finds that because there is potentially Accomplish a rational causal link between the asserted protected activities and the alleged adverse actions, the Complaint states a plausible claim for Retaliation.  As to the 42 U.S.C. § 1981 claim for Retaliation, Defendant's Motion to Dismiss is denied.

### D.  Count III – Title VI of the Civil Rights Act

Plaintiff also brings a claim for disparate treatment under Title VI of the Civil Rights Act of 1964.  ECF No. 13 ¶ 116.  Defendant moves to dismiss on grounds that Plaintiff has not plausibly

alleged that he was denied a benefit or was treated less favorably than students of non-minority status.  ECF No. 14 at 15.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To state claim under Title VI, a plaintiff must allege that she "(1) was a member of a protected class, (2) qualified for the benefit or program at issue, (3) suffered an adverse action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Se. Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015); *Rightmyer v. Philly Pregnancy Ctr., P.C.*, 2024 WL 897983, at *3 (E.D. Pa. Mar. 1, 2024); *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 927 (E.D. Pa. 2016) (all citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir.2014)).

Plaintiff argues that these elements are met here: (1) Plaintiff is a racial minority, a protected class, (2) who qualified for the receipt of his degree, (3) who faced unnecessary barriers, unfairly preventing him from defending his dissertation, and thereby removing his ability to earn his degree, and (4) these adverse actions occurred under circumstances that give rise to an inference of discrimination.  ECF No. 13 ¶¶ 122–127.

Defendant posits that Plaintiff merely alleges facts showing that he did not qualify to receive his degree.  He "failed to complete his dissertation submission and defense of his dissertation despite Duquesne extending the statute of limitations for him to do so."  ECF No. 14 at 19.  Plaintiff did not adhere to the rules required to graduate, and so Defendant reasonably and understandably did not allow him to continue in the program.

But Plaintiff pleads adequate facts for the Court to infer that this seemingly neutral approach by Defendant amounts to harsher treatment for a minority student than that granted to his non-minority peers. Plaintiff alleges that "similarly situated students who were not minorities" were "treated differently," ECF No. 13 ¶ 123, presumably in that either they did not face as many barriers to defending their dissertations or they were not dismissed without recourse simply for failing to meet a soft deadline.

The Court finds that Plaintiff has properly alleged that the adverse action taken against Plaintiff gives rise to an inference of discrimination. As such, as to the claim under Title VI of the Civil Rights Act, Defendant's Motion to Dismiss is denied.

### IV. Conclusion

For the reasons discussed above, the Court denies in part and grants in part Defendant's Motion to Dismiss. The Court denies the Motion as to the Retaliation and Civil Rights Act claims and grants the Motion as to the two contract-related claims. The Court grants Plaintiff leave to amend his Complaint within 21 days of the date of this memorandum order.

BY THE COURT:

*/s/Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: [●]

cc: All counsel of record,